UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 1:12-CR-42 |
| v. | ) | |
| | ) | Judge Curtis L. Collier |
| JOSHUA DOBSON and PAUL GOTT III | ) | |
| | ) | |

## M E M O R A N D U M

Before the Court are a number of post-trial motions filed by Defendants Joshua Dobson (Court File Nos. 87, 88, 91)[1] and Paul Gott (Court File Nos. 89, 90). The Government responded to Defendants' motions (Court File No. 94). After Defendant Dobson replied to the Government's response, the Government sought leave to file a supplemental brief pursuant to Local Rule 7.1(d) (Court File No. 96), which the Court allowed (Court File No. 98). The Government subsequently filed such a brief (Court File No. 99), to which both Defendants replied (Court File Nos. 101, 102).

Defendants were tried before a jury and convicted of seven counts of a twelve-count Indictment (Court File Nos. 84, 85). Defendants now seek a judgment of acquittal pursuant to Fed. R. Crim. P. 29. They argue the Government failed to produce sufficient evidence to sustain their convictions as to a number of counts in the Indictment. Defendants also seek an arrest of judgment under Fed. R. Crim. P. 34, due to alleged inadequacies of the charging instrument. For the following reasons, the Court will **DENY IN PART** and **GRANT IN PART** Defendants' motions (Court File

---

[1] Counsel for Joshua Dobson, Christopher Townley, represented Mr. Dobson at trial and filed all of the post trial motions addressed in this memorandum. On June 14, 2013, attorney Gerald Summers filed a notice of appearance on Dobson's behalf (Court File No. 100). On July 12, 2013, attorney Christopher Townley filed a motion to withdraw as counsel for Mr. Dobson (Court File No. 111). That motion was subsequently granted (Court File No. 112).

Nos. 87, 88, 89, 90, 91).[2]  Specifically, the Court will grant Defendants' motions on Count Seven because the Government offered insufficient evidence to establish venue as to that count. Defendants' motions will be denied as to the other counts.

## I.    BACKGROUND

This case proceeded to trial before the Court in April 2013.  The Indictment alleged a scheme to defraud using interstate wire communications in violation of 18 U.S.C. § 1343.  The particulars of the scheme[3] were that Defendants, a part owner and an employee of entities that were referred to in the Indictment as the Southern Group, were involved in the marketing and sale of real properties in a development owned by the Southern Group.  Because of the downturn in the economy, Southern Group experienced a sharp decline in sales of its properties and was having difficulty servicing its loans at various financial institutions.  Defendants thereafter concocted a scheme to obtain money from financial institutions that offered mortgage loans by generating purported sales of the properties and then servicing Southern Group's loans with the resulting income.

---

[2] Court File Number 91 was docketed as a motion to amend Dobson's prior motion for acquittal, but the document is actually an amendment itself and contains a substantive argument. To the extent the Court is required to grant Defendant leave to amend his motion, that motion will be **GRANTED**.

[3] The Court has taken the liberty of combining allegations from the Indictment along with proof at trial so that the nature of the scheme is clear.  The Indictment in this case was extremely poorly drafted with very little attention given to setting out the scheme to defraud to any degree. During trial, the Court characterized the drafting as shoddy.  One of the responsibilities of supervisors in a United States Attorney's office is to review and approve indictments.  Line Assistant U.S. Attorneys because of the press of other obligations, lack of experience, or inattention may do a substandard job in drafting an indictment.  In such cases the supervisor must ensure that the indictment meets reasonable standards.  That is especially true in a case of this sort where the monetary loss is large and there is a great public interest in the case.  It is obvious in this case that the necessary review process did not work.   In cases of this type a bare bones indictment is an invitation to problems with proof, notice to the defendants, and evidence.  All those problems occurred at the trial of this case.

2

The scheme involved Defendants' representations to prospective buyers that they could purchase the properties without making a down payment or mortgage payments for a period of three years. Defendants realized it was unlikely that financial institutions would make loans to borrowers under such circumstances so Defendants engaged in efforts to disguise the fact that Southern Group would be furnishing the money for the down payment and making the mortgage payments. Defendants accomplished this by causing false closing documents to be generated, by causing false "gift" letters to be generated and submitted to the financial institutions, and by causing the borrowers not to be truthful and forthcoming with the financial institutions. In these "gift" letters, an individual would purport to be the purchaser's relative providing the necessary down-payment funds as a gift when it was apparent the purported borrower did not have sufficient funds to make the down payment. On two of these occasions, the author of the gift letter was not in fact a relative of the purchaser. Moreover, in all such occasions the funds never originated with the letter author but originated from Defendants.

As an inducement to prospective borrowers to purchase properties, Defendants represented to the prospective borrowers that, at the end of the three-year period, the Southern Group would buy back the properties at a profit to the borrowers. In furtherance of this scheme, Defendants wired funds sufficient for the down payments into the purported purchaser's bank accounts. The purchasers would then wire the funds to the financial institution providing the mortgage, representing the funds as their own. As a result of these representations, a number of individuals that did not have the financial ability to purchase the properties and pay the mortgage loans, and had no interest in paying the loans, became purported purchasers of Southern Group properties. As a result of this scheme, financial institutions were induced to make sizable loans to non-credit worthy

3

borrowers who had no interest in paying the loans. As could be predicted, when the economy did not recover, Defendants did not carry out their representations and the financial institutions lost millions of dollars.[4]

Count One of the Indictment charged Defendants with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343 and to commit money laundering in violation of 18 U.S.C. § 1957. Counts Two through Eight of the Indictment charged seven substantive counts of wire fraud in violation of 18 U.S.C. § 1343. Counts Nine through Twelve of the Indictment charged four counts of money laundering in violation of 18 U.S.C. § 1957.

At trial, the Government offered testimony from a number of the purchasers who described their interaction with Defendants. The Government also offered testimony of representatives of the financial institutions, law enforcement, and authors of the gift letters. For their part, Defendants argued no fraud occurred. It was Defendants' contention the funds alleged to be provided for the down payment actually represented a purchase-option or lease-back. After a predetermined period of time, generally three years, Defendants agreed to purchase the property back from the purchaser. The funds wired to the respective purchaser's accounts constituted the consideration for this option. With respect to the gift-letter transactions, Defendants claimed they were unaware the mortgage program required the funds not originate with the seller and that the gift provider be a relative of the purchaser. It was Defendants' contention an individual named Keith Smartt informed them the only requirement of the program was the funds be in the gift provider's account for a period of time

---

[4] One borrower, Dennis Sanchez, testified he obtained two parcels from Defendants for $350,000. Sanchez obtained a mortgage loan. After Defendants failed to pay his mortgage notes, he was unable to keep current on his loans. He testified he had tried to sell the properties but could not get $4,000 for a single parcel.

4

before the funds were wired to the purchaser. Without the requisite intent to defraud, Defendants argued, no crime occurred.

The jury convicted Defendants of seven of the twelve counts in the Indictment. Defendants were convicted of the conspiracy count, the gift-letter transaction wire fraud counts, and the money laundering counts that corresponded to the gift-letter transactions. The jury acquitted Defendants of Counts Two, Three, Four, Nine, and Ten. Counts Two through Four alleged wire fraud in connection with the transactions that did not involve gift letters. Counts Nine and Ten contained money laundering charges that corresponded to those three transactions.

At close of the Government's proof, Defendants orally moved under Fed. R. Crim. P. 29 as to all counts, arguing the evidence was insufficient, the Indictment failed to adequately allege a wire fraud scheme, and the evidence in support of Counts Nine, Eleven, and Twelve varied from the allegations in the Indictment. The Court took the motions under advisement. After the close of Defendants' proof, but before the testimony of a subsequent witness the Court allowed the Government to present, Defendants raised a venue issue with respect to Count Seven. Because all proof was not yet in, the Court considered that motion a supplement to their prior Rule 29 motions. Pursuant to Rule 29, Defendants timely renewed their motions following the guilty verdicts.

## II.   STANDARD OF REVIEW

### A.  Motion for Judgment of Acquittal

Under the Federal Rules of Criminal Procedure, the defendant may move for judgment of acquittal or renew such motion within fourteen days after a guilty verdict. Fed. R. Crim. P. 29(c). Such a motion should be granted if "the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In reviewing a challenge to the sufficiency of the evidence, the Court determines,

5

"whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The Court gives the prosecution "the benefit of all reasonable inferences from the testimony." *United States v. Oufnac*, 449 F. App'x 472, 475 (6th Cir. 2011) (quoting *United States v. McAuliffe*, 490 F.3d 526, 537 (6th Cir. 2007)). In addition to construing all reasonable inferences to the benefit of the prosecution, the Court must also make all "credibility choices in support of the verdict." *United States v. Campbell*, 549 F.3d 364, 374 (6th Cir. 2008) (citation omitted).

When deciding a motion under Rule 29 of the Federal Rules of Criminal Procedure, a court does "not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011) (quoting *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009)). A sufficiency-of-the-evidence challenge under Fed. R. Crim. P. 29 "'is a very heavy burden' for the convicted defendant to meet." *United States v. Kernell*, 667 F.3d 746, 756 (6th Cir. 2012) (quoting *United States v. Jones*, 641 F.3d 706, 710 (6th Cir. 2011)).

If, as here, a court reserves ruling on a motion for judgment of acquittal, the court may decide the motion after the jury returns a verdict of guilty on the basis of the evidence at the time the ruling was reserved. Fed. R. Crim. P. 29(b); *United States v. Wagner*, 382 F.3d 598, 611 n.2 (6th Cir. 2004).

### B. Motion for Arrest of Judgment

A defendant may move to arrest his judgment if "(1) the indictment or information does not charge an offense; or (2) the court does not have jurisdiction of the charged offense." Fed. R. Crim.

P. 34.  Evidence presented at trial is irrelevant to such a motion. *United States v. Kernell*, 742 F. Supp. 2d 904, 906 (E.D. Tenn. 2010).

## III.  DISCUSSION

Defendants argue generally the evidence was insufficient to support a conviction on all counts.  They also fault the proof regarding venue as to two of the counts.  Defendants further argue the Indictment contained insufficient allegations and fatal variances from the proof offered at trial. The Court will consider these arguments in turn.

### A.  Sufficiency of the Evidence

#### 1.  Conspiracy

"A conviction for conspiracy to commit . . . fraud requires proof beyond a reasonable doubt that the defendant knowingly and willfully joined in an agreement with at least one other person to commit an act of . . . fraud and that there was at least one overt act in furtherance of the agreement." *United States v. Warshak*, 631 F.3d 266, 308 (6th Cir. 2010) (quoting *United States v. Cantrell*, 278 F.3d 543, 546 (6th Cir. 2001)).  Defendants argue the evidence is insufficient to support the conspiracy conviction.

Defendants provide relatively little argument to this point.  Defendant Dobson moves on "general grounds" to all counts alleging insufficient evidence and reaffirms his theory at trial that he had no knowledge the gift-letter transactions were fraudulent.  Similarly, Gott argues the Government failed to establish a conspiracy.  For its part, the Government points to the substantial proof offered at trial.  The Government presented testimony from several bank officials that their institutions had made loans to individuals purchasing properties from the Southern Group.  These officials all testified that their institutions did not know the money for the down payments came from

the Southern Group. Nor did their institutions know that the Southern Group would be making the mortgage payments on the loans. The officials all testified, had their institutions known the true facts, they would not have made the loans. They all testified to the importance of borrowers on real property loans having a financial stake in the payment of the loan. Some of these witnesses called this having some "skin in the game." Many witnesses testified to receiving direct instructions from Gott explaining how to fill out the gift letters and to whom the "gift" funds should be wired. Keith Smartt testified he informed both Dobson and Gott of the gift-letter program's requirements, including that the gifted funds must not come from the seller. However, Shirlene Connor testified Gott instructed her to provide funds to Dwayne Jiles and Louise Joseph, both of whom purchased property from the Southern Group entities. Numerous emails from Gott to some of these individuals detail the program, and explain both he and Dobson could further explain the gift-letter transactions. Moreover, many of the emails between Gott and other individuals were also sent to Dobson.

This evidence is sufficient under Rule 29. Considering the evidence presented, a reasonable juror could have found Dobson and Gott willfully joined in an agreement to defraud the financial institutions. Additionally, evidence supported a finding a number of the overt acts were performed, including the wire transfers representing the substantive wire fraud charges. Defendants' motions will be **DENIED** on this ground.

### 2. Wire Fraud

#### a. General Sufficiency

A wire-fraud conviction under 18 U.S.C. § 1343 requires proof that "the defendant devised or willfully participated in a scheme to defraud[,] . . . used or caused to be used an interstate wire communication in furtherance of the scheme [,] . . . and . . . intended to deprive a victim of money

8

or property." *United States v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010) (internal quotation marks omitted). The Sixth Circuit recently articulated the elements to include "(1) devising or intending to devise a scheme to defraud (or to perform specified fraudulent acts); (2) involving a use of [a wire]; [](3) for the purpose of executing the scheme or attempting to do so." *United States v. Kennedy*, 714 F.3d 951, 958 (6th Cir. 2013) (quoting *United States v. Frost*, 125 F.3d 346, 354 (6th Cir.1997)).[5]

Sufficient evidence was presented to demonstrate all of the elements of wire fraud. First, a scheme to defraud was well established. "[A] scheme to defraud must involve [i]ntentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed." *Frost*, 125 F.3d at 354 (quoting *American Eagle Credit Corp. v. Gaskins*, 920 F.2d 352, 353 (6th Cir.1990) (quoting *Bender v. Southland Corp.*, 749 F.2d 1205, 1216 (6th Cir.1984) (quoting *Epstein v. United States*, 174 F.2d 754, 765 (6th Cir.1949)) (internal citations and quotation marks omitted). Thus it is sufficient if the purpose of the fraud is to cause a loss of money or property to another. The formulation of what it means to defraud is often given in these terms:

> [I]n relation both to mail fraud and wire fraud, there is no technical or precise definition of an unlawful "scheme to defraud." "The standard is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." An unlawful scheme to defraud may consist of "concealment of a material fact."

*United States v. Chew*, 497 F. App'x 555, 563 (6th Cir. 2012) (internal citations omitted) (quoting *United States v. Daniel*, 329 F.3d 480, 486 (6th Cir.2003) (internal quotation marks and citation

---

[5] Although quoting *Frost*'s discussion of the mail fraud statute, the court noted "[t]his court has interpreted the mail-fraud and wire-fraud statutes as having essentially the same elements, except for the use of the mails versus the wires." *Kennedy*, 714 F.3d at 958.

omitted) (citing *Carpenter v. United States*, 484 U.S. 19, 25 n. 6 (1987)).

Dobson and Gott orchestrated a broad scheme to obtain money from financial institutions by convincing these financial institutions potential borrowers had sufficient funds to obtain mortgages when in fact they had no such funds. The lending institutions were led to believe that legitimate borrowers were truly interested in buying property, they had the financial means to do so, and their own money was being used for the down payment and monthly payments. Testimony at trial suggested these companies would not have otherwise lent to these individuals had they been aware the down payment was provided by the seller. In a word, these institutions were victims of fraud. As a result of the fraudulently obtained loans, the proceeds would be provided to the Southern Group entities, and by extension, Dobson and Gott.

The evidence demonstrated both Defendants willfully participated in this scheme. Dobson was a member of the family that controlled the Southern Group entities and may have been an owner of some of the entities. Gott, on the other hand, received money from the transactions and had a personal financial interest in the scheme. He was also a close friend of Dobson's. Both Defendants spoke with Keith Smartt about the gift-letter program. Dobson was also copied on a number of emails, which discussed the details of these fraudulent letters and stated he was a point of contact for further information. Moreover, wire monetary transfers were made in furtherance of the scheme from Gott to Tania Malik and Shirlene Connor.

Gott's suggestion he never "presented anything that he thought was false to the bank" is immaterial: A scheme to defraud need not involve a false statement, pretenses, promises, or representations. *See United States v. Mann*, 234 F.3d 1270, 2000 WL 1597824, at *3 (6th Cir. Oct. 20, 2000) ("We first observe that proof of an affirmative misrepresentation is not required to sustain

10

a conviction for bank fraud in this Circuit."); *see also United States v. Rice*, No. 1:11-CR-15, 2011 WL 3841973, at *2 (E.D. Tenn. Aug. 30, 2011) (discussing this issue in the context of the bank fraud statute). The phrase "a scheme to defraud"

> was broadly conceived to include conduct designed to deceive in order to obtain something of value, which . . . may or may not include conduct involving false statements or misrepresentations of fact. . . . [T]he focus of the offense of a scheme to defraud is on the intended end result, not on whether a false representation was necessary to effect the result. Thus it matters not whether the fraudulent scheme was accomplished by an affirmative misrepresentation nor whether the fraud succeeded and the victim deceived.

*United States v. LeDonne*, 21 F.3d 1418, 1426 (7th Cir. 1994) (citations and internal quotation marks omitted); *see also Mann*, 2000 WL 1597824, at *3-4 (quoting this portion of *LeDonne*).

Moreover, evidence was presented at trial Gott directed individuals to submit the false information to the financial institutions as a part of the scheme to defraud. Although he argued at trial and again in his post-trial motion he was unaware the information was false, such a claim was demonstrably refuted: The gift-letters required a statement the funds did not come from the seller, which he admitted was not the case. Connor also testified she and Dobson discussed the fraudulent gift letter in the Joseph deal, and Dobson indicated it was to be done similarly to the gift letter in the Jiles deal.

Gott's suggestion he should be acquitted of these charges because he did not personally benefit is similarly beside the point. A defendant need not have personally gained money or property as long as he willfully participated in a scheme to defraud. *See Kennedy*, 714 F.3d at 958 ("Scarborough's contention that she did not obtain the money for her own benefit is irrelevant because obtaining money for one's personal use is not an element of wire or mail fraud."); *United States v. Ames Sintering Co.*, 927 F.2d 232, 235 (6th Cir. 1990) ("[T]he prosecution need not prove

11

that the scheme was successful or that the intended victim suffered a loss or that the defendant secured a gain.") (quoting *United States v. O'Malley*, 535 F.2d 589, 592 (10th Cir. 1976)). Moreover, his argument is contrary to the proof: He received a commission on the transactions. Defendants do not refute they received mortgage principal from the defrauded financial institutions. It is also uncontested that the victim financial institutions that made the loans in this case lost millions of dollars.

Finally, Gott argues Southern Group was not the seller of the property for Count Six. This argument was made at trial and rejected by the jury. Dobson's sister was involved in the transaction and Southern Group received a significant amount of money from the deal. Moreover, this transaction was clearly a part of the overall scheme in which Defendants willfully participated.

This evidence is sufficient under Rule 29. Defendants' motions will be **DENIED** on this ground.[6]

### b. Venue

As to Counts Seven and Eight, Defendants also argue venue was not sufficiently established to obtain a conviction. The United States Constitution and Fed. R. Crim. P. 18 require a defendant be tried for a crime where that crime was committed. *United States v. Wood*, 364 F.3d 704, 709-10 (6th Cir. 2004); *see also* Fed. R. Crim. P. 18 ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed."). Venue is appropriate "only in the district where the conduct comprising the essential elements of the offense

---

[6] Defendants also originally argued they were entitled to a judgment of acquittal for Count Seven because an email does not necessarily constitute a wire communication. The Court allowed the Government to offer more proof on this point after the close of Defendants' cases. Because these arguments were not raised in their post-trial motions, the Court will not address them. Regardless, the Court grants Defendants' motions regarding Count Seven on venue grounds.

occurred." *Wood*, 364 F.3d at 710. Failure to establish venue will require a reversal of the conviction if the defendant objects at trial. *Id.* However, the Government need only establish venue by a preponderance of the evidence. *United States v. Kuehne*, 547 F.3d 667, 677 (6th Cir. 2008).

Here, the parties disagree at what point Defendants objected on venue grounds. Defendants argue they objected to the Government's failure to establish venue to Count Seven at the close of the Government's proof. The Government, however, ordered the transcript from the Rule 29 arguments following its case-in-chief and venue was not discussed. Defendant Dobson argues his general insufficiency-of-the-evidence argument preserved his venue argument at that time, based on his statement after the close of the Government's proof that "as a general matter, as to each count of the evidence, we would present to the Court our position the evidence is insufficient to sustain a conviction, also that the evidence is insufficient to establish conspiracy."

The Court disagrees. As Defendant correctly notes, the Sixth Circuit has observed "a general challenge to the Government's proofs in a Rule 29 motion for judgment of acquittal suffices to preserve the issue of venue." *United States v. Zidell*, 323 F.3d 412, 421 (6th Cir. 2003). However, the Sixth Circuit also noted "a more specific Rule 29 motion operates to waive all grounds not specified." *Id.* In *Zidell*, the court relied on a Second Circuit decision, which stated the following.

> [W]here as here a motion for acquittal is made on specified grounds which do not include any objection to venue, we think that objection has been waived. The specification of grounds in the motion is an indication that counsel has evaluated the record and has these particular reasons for his motion. His omission of venue from those reasons is similar to a general failure to move for acquittal in spite of the government's failure to provide any substantial evidence to support the alleged venue. In the latter circumstances, the Sixth Circuit found the objection waived, *United States v. McMaster*, 343 F.2d 176, 181 (6 Cir.), cert. denied, 382 U.S. 818, 86 S.Ct. 42, 15 L.Ed.2d 65 (1965); *cf. United States v. Michelson*, 165 F.2d 732, 734 (2 Cir.) (dictum), *aff'd*, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948).

The Ninth Circuit has found waiver where the defendant made a motion to

acquit on specific grounds and did not mention venue. *Gilbert v. United States*, 359 F.2d 285, 288 (9 Cir.), cert. denied, 385 U.S. 882, 87 S.Ct. 169, 17 L.Ed.2d 109 (1966); *United States v. Brothman*, 191 F.2d 70, 72-73 (2 Cir. 1951) (dictum). We think this the proper result. It is not unreasonable to expect the defendant to make some reference to the venue point in order to save his objection for appeal. Where he moves to acquit without specification, we might assume venue to be included among his unarticulated disagreements with the conduct of the case, but where he does specify grounds for the motion and omits mention of venue we must conclude that he cannot be considered to have raised a question concerning the place of trial. Since there can be no doubt that Rivera did move for acquittal on specific grounds without mention of improper venue at that time, he waived any objection he may have had.

*United States v. Rivera*, 388 F.2d 545, 548 (2d Cir. 1968); *see also United States v. Dandy*, 998 F.2d 1344, 1357 (6th Cir. 1993) (quoting this portion of *Rivera*).

Although Defendant prefaced his Rule 29 arguments with a general sufficiency-of-the-evidence argument, he proceeded to make specific arguments in favor of his motion. Those arguments included the sufficiency of the Indictment's wire fraud allegations, the Indictment's variances from the proof at trial, and specific arguments regarding the insufficiency of the evidence.

> Your Honor, as a general matter, as to each count of the evidence, we would present to the Court our position the evidence is insufficient to sustain a conviction, also that the evidence is insufficient to establish conspiracy.
> . . . .
> I would note that as it relates to Count 3 and Count 4 there has been no evidence presented that the money that was used in that Count 3 and 4 was anything other than what Mr. Sanchez was entitled to as a matter of -- from his previous purchase, and, as such, those were funds that were his funds, and there's been no evidence to show that those were funds that belonged to Southern for the use of down payment as alleged.
> . . . .
> [Even assuming an email constitutes a wire transfer,] you still have to show that the transmission occurred in interstate commerce, and we would also say that it has -- they have not shown that as well, as it relates to [Count Seven].

(Court File No. 93, pp. 3, 6). As explained by the Second Circuit, "specification of grounds in the

motion is an indication that counsel has evaluated the record and has these particular reasons for his motion." *Rivera*, 388 F.2d at 548. "[W]here he does specify grounds for the motion and omits mention of venue we must conclude that he cannot be considered to have raised a question concerning the place of trial." *Id.* Accordingly, the Court concludes reference to general sufficiency of the evidence did not preserve the venue argument at that point.

Defendants did, however, raise the issue of venue with regard to Count Seven at the close of Defendants' proof. Because the venue defect was not apparent from the face of the Indictment, Defendants were not required to raise the issue pretrial.[7] *See United States v. Grenoble*, 413 F.3d 569, 573 (6th Cir. 2005) ("Although objections to defects in venue are usually waived if not asserted before trial, where the defect is not 'apparent on the face of the indictment,' and the defendant does not have notice of the defect through other means, a conclusion of waiver is not appropriate.") (internal citations omitted). In *United States v. McMaster*, 343 F.2d 176, 181 (6th Cir. 1965), the Sixth Circuit held an objection to venue was waived because it was not raised prior to the verdict. This holding has been noted by subsequent Sixth Circuit panels. *See United States v. Washington*, 995 F.2d 1068, 1993 WL 206542, at *2 (6th Cir. May 27, 1993) ("If there is no objection to venue prior to the verdict, any such objection is waived.") (citing *McMaster*, 343 F.3d at 181); *see also Dandy*, 998 F.2d at 1357 (quoting *Rivera*, 388 F.2d at 548 (citing *McMaster*, 33 F.2d at 181)); *United States v. Adams*, 803 F.2d 722, 1986 WL 17714, at * 9 (6th Cir. Sept. 22, 1986) ("[W]hen an indictment contains a proper allegation of venue so that a defendant has no notice of a defect of

---

[7] The Government informs the Court it will not rely on case law suggesting venue must be raised before trial. To the extent the Government is not relying on these cases because it concedes the defect was not apparent from the face of the Indictment, the Court agrees. Count Seven of the Indictment alleges an email was sent from Gott "in Tennessee" and Count Eight alleges a wire "from Tennessee."

15

venue until the government rests its case, the objection is timely if made at the close of the evidence.") (quoting *United States v. Black Cloud*, 590 F.2d 270 (8th Cir. 1979)). Accordingly, Defendants' motions made before the verdict sufficiently preserved the issue.

Although the Court considered the venue argument a supplement to Defendants' prior Rule 29 motions and reserved ruling, the Court must consider that motion on the basis of the evidence "at the time the ruling was reserved." Fed. R. Crim. P. 29(b). Accordingly, pursuant to Rule 29, the Court will consider the evidence presented in both the Government's case-in-chief and Defendants' cases when considering Count Seven.

Count Seven alleges Gott sent an email to "Tahia" Malik.[8] Defendant argues the Government failed to offer any evidence to suggest the email was either sent from or received in the Eastern District of Tennessee. The Government concedes it failed to offer evidence to that effect in its case-in-chief, but argues Gott testified during Defendants' cases that he worked primarily from his home, which was located in the Eastern District of Tennessee.

However, this evidence is insufficient to support a finding of venue. For instance, in *Wood*, 364 F.3d at 713, the Government relied on the significant nexus between the district and the fraudulent scheme. The Sixth Circuit held "venue in a mail fraud case is limited to districts where the mail is deposited, received, or moves through, even if the fraud's core was elsewhere." *Id.* This conclusion was based on the application of 18 U.S.C. § 3237(a),[9] which provides "[a]ny offense involving the use of the mails[ or] transportation in interstate or foreign commerce . . . is a

_____

[8] This must have been a typographical error. The proof established Tahira Malik received the email.

[9] This statute is applicable to wire fraud as well. *Grenoble*, 413 F.3d at 573 ("Under 18 U.S.C. § 3237, wire fraud is a continuing offense crime . . . .").

16

continuing offense and . . . may be inquired of and prosecuted in any district from, through, or into which such commerce[ or] mail matter . . . moves." Accordingly, a nexus between the district and the scheme to defraud was insufficient to establish venue.

Moreover, as to the other counts, the Government relied on evidence a witness traveled to the area "quite a bit" and that the checks involved in the scheme "were probably all written while we were visiting the offices in [the district]." *Wood*, 364 F.3d at 713-14. The defendant pointed to undisputed evidence the letter was sent to a location outside the district and the checkbook was kept outside the district as well. Considering this evidence, the court found venue improper.

> Johnson's testimony that any checks written while she was traveling in Michigan were "probably all written while we were visiting the offices in Battle Creek" does not answer the question at hand. In the first place, she had no specific recollection that the particular two checks in question were in fact written while she was in Michigan. Nor was she asked if, after writing any checks in Battle Creek, she then *mailed* them from Battle Creek. Under these ambiguous circumstances, we conclude that the government failed to prove by a preponderance of the evidence that Johnson actually mailed the two checks at issue from the Western District of Michigan. This precludes a finding that venue was proper with respect to Counts 17 and 18.

*Id.* at 714 (emphasis in original).

Similarly, here, evidence Gott usually worked from home is simply insufficient to satisfy the Government's evidentiary burden on venue. Unlike in *Wood*, the location where Gott prepared the email is likely where he sent it. But the Government has pointed to nothing in his testimony that suggests he sent this individual email from the Eastern District of Tennessee. Even though Defendant did not preserve his venue argument at the close of the Government's proof, the evidence submitted is insufficient to establish venue in the Eastern District of Tennessee for Count Seven. Accordingly, Defendants' motions will be **GRANTED IN PART** on this ground. The Court will grant Defendants' motion on Count Seven.

17

Venue as to Count Eight was not addressed until Defendants' post-verdict motions. Because, as noted above, a defendant waives any venue objection if not raised before the verdict, Defendants' motions must be **DENIED** as to Count Eight.

### 3. Money Laundering

Defendants do not offer argument as to the sufficiency of the evidence regarding the money laundering charges beyond their argument the proof varied from the allegations in the Indictment, which the Court discusses below. In order to establish a violation of 18 U.S.C. § 1957, the Government must show (1) Defendants knowingly engaged or attempted to engage in a monetary transaction; (2) Defendants knew the transaction involved criminally derived property; (3) the criminally derived property was of a value greater than $10,000; (4) the criminally derived property was also, in fact, derived from a specified unlawful activity, in this case, wire fraud in violation of 18 U.S.C. § 1343; and (5) the monetary transaction took place in the United States, or outside the United States, but the Defendant is a "United States person." *United States v. Cornish*, 68 F. App'x 557, 559 (6th Cir. 2003).

The evidence supports Defendants' convictions for money laundering. Defendants received mortgage principal from defrauded financial institutions. For the reasons stated above, there is sufficient evidence to establish Defendants knew the mortgage principal was criminally derived from a specified unlawful activity, in this case, wire fraud. There was also clear evidence the money laundering occurred in the United States. To the extent Defendants argue the evidence was insufficient to establish money laundering, the Court disagrees.

Moreover, although the Court has granted in part Defendant's motion with respect to Count Seven, Count Eight has survived. The funds used in Count Eleven were derived from the transaction

18

with Tahira Malik, to which both Counts Seven and Eight related. If both these counts had been disposed of by the Court, Count Eleven may have been subject to a judgment of acquittal as well.[10] However, because Count Eight has survived, Count Eleven survives as well. The Court will **DENY** Defendants' motions on this ground.

## B. Sufficiency of the Indictment

In the context of both their Rule 29 motions for acquittal and their Rule 34 motions for arrest of judgment, Defendants argue the Indictment insufficiently alleges wire fraud. "An indictment must include 'a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *United States v. Schaffer*, 586 F.3d 414, 422 (6th Cir. 2009) (quoting Fed. R. Crim. P. 7(c)(1)). In order to sufficiently charge a defendant, an indictment must "(1) 'set out all of the elements of the charge[d] offense and must give notice to the defendant of the charges he faces[,]' and (2) 'be sufficiently specific to enable the defendant to plead double jeopardy in a subsequent proceeding, if charged with the same crime based on the same facts.'" *Id.* (quoting *United States v. Douglas*, 398 F.3d 407, 413 (6th Cir. 2005)).

### 1. Sufficient Allegations

The wire fraud statute criminalizes those who "devise[] or intend[] to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmit[] or cause[] to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures,

_____

[10] Defendant Dobson and the Government apparently agree the money laundering counts would have survived regardless. Defendant Gott argues if the Court finds venue was not established as to Counts Seven and Eight the related money laundering counts should be dismissed as well. Because Count Eight survived both Defendants' motions, the Court need not decide this issue.

19

or sounds for the purpose of executing such scheme or artifice." 18 U.S.C. § 1343.

Defendants argue the wire fraud counts in the Indictment fail to allege the object of the scheme to defraud was to deprive another of money or property. The Indictment's wire fraud charges refer to the allegations of the conspiracy count, and then list six separate wire transfers caused in support of the scheme.[11] The entirety of the wire fraud allegations is as follows.

> In furtherance of said scheme to defraud the financial institutions listed below and to accomplish its purposes, the defendants, Joshua Dobson and Paul Gott, caused to be transmitted by certain writings and signals, i.e. the interstate wire transfers of funds listed below, on the dates listed below for the purpose of executing said scheme to defraud, each such instance constituting a separate count of wire fraud, in violation of Title 18, United States Code, Section 1343[.]

The Indictment then alleges the circumstances of the wires, including the dates, amounts, financial institutions involved, and who wired the funds. The wire fraud counts also incorporate the conspiracy allegations, which state the following.

> [] It was a part of said conspiracy that the defendants, Joshua Dobson and Paul Gott, would and did offer property for sale, but assured prospective buyers that they would furnish the down-payment to the buyer at closing.
> [] It was a further part of said conspiracy that the defendants, Joshua Dobson and Paul Gott, would and did assure buyers that they would provide the monthly mortgage payments for the buyers for a period of three years.
> [] It was a further part of said conspiracy that the defendants, Joshua Dobson and Paul Gott, would and did deceive the mortgage lenders by creating the appearance through false closing documents, and in some cases false "gift letters," that the down-payment was being provided by the buyer, when in fact it was secretly being provided by the seller.
> [] It was a further part of said conspiracy that the defendants, Joshua Dobson and Paul Gott would and did represent to the buyers that they would purchase an option to buy back the property from the buyers at a profit to the buyers at the end of a three-year period.
> [] It was a further part of said conspiracy that the defendants, Joshua Dobson and Paul Gott, would and did accomplish the aforesaid scheme to defraud the

---

[11] Count Seven, dismissed on venue grounds, alleged an email sent in furtherance of the scheme.

mortgage lenders through a variety of wire transfers of funds and deposits of illegal proceeds in interstate commerce some of which constituted wire fraud in violation of Title 18, United States Code, Section 1343 (as charged in Counts 2 through 8 below) and some of which constituted money laundering in violation of Title 18, United States Code, Section 1957 (as charged in Counts 9 through 12 below).

In the overt acts allegations, the Indictment describes the various wire transfers, discussions among the defendants and others, and representations to the defrauded financial institutions. Many of these overt act allegations discuss false representations regarding down payments and fraudulent documents.

Because the statute separates "scheme or artifice to defraud" and "for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" with the disjunctive "or," the Government argued the statute creates two separately indictable offenses. Because the Government was proceeding on the first prong–a "scheme or artifice to defraud"–its failure to include an allegation the object of the scheme was to deprive a victim of money or property was not in error and was not fatal to the Indictment. The Government also argued, in the alternative, any inadequacy in the charging document was harmless error because Defendants suffered no prejudice in mounting their defenses.

In response, Defendants argued the Supreme Court has rejected the use of the disjunctive to create a separate offense in the mail and wire fraud statutes. In *McNally v. United States*, 483 U.S. 350, 359 (1987), the Court considered the mail fraud statute and concluded "adding the second phrase simply made it unmistakable that the statute reached false promises and misrepresentations as to the future as well as other frauds involving money or property." *See also Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987) (considering *McNally* in the context of the wire fraud statute and noting "[t]he mail and wire fraud statutes share the same language in relevant part, and accordingly

21

we apply the same analysis to both sets of offenses here").  Accordingly, the Court concluded the

mail fraud statute is "limited in scope to protection of property rights," *McNally*, 483 U.S. at 360,

and does not reach intangible rights.[12]  *See United States v. Leahy*, 464 F.3d 773, 787 (7th Cir. 2006)

("The mail and wire fraud statutes require that the object of the fraud is money or property, rather

than an intangible right.") (citing *Cleveland v. United States*, 531 U.S. 12, 15 (2000); *McNally*, 483

U.S. at 360).  Defendants argue *McNally* and *Cleveland*, which reaffirmed *McNally*'s holding,

require the Government to affirmatively allege the object of the scheme to defraud is to obtain

money or property.

The Court disagrees with Defendants.  Defendants were charged with executing a scheme

to defraud through the use of a wire.  The Government was required to allege (1) a scheme to

defraud and (2) the use of a wire (3) the purpose of which was to execute the scheme to defraud.

The Indictment contained these allegations.

Defendants' confusion arises from a common error with respect to the mail and wire fraud

statutes.  That error is to read the two prongs of the statutes as if there was just one prong.  The wire

fraud statute provides for a scheme to defraud (which does not require a false or fraudulent

statement, pretense, representation, or promise) and for a scheme to obtain money or property by

---

[12] Following these opinions, Congress attempted to reinstate much of the pre-*McNally* intangible fraud case law by enacting 18 U.S.C. § 1346, the "honest service fraud" statute, which the Supreme Court considered in *Skilling v. United States*, 130 S. Ct. 2896 (2010).  Section 1346 clarifies, "[f]or the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."  However, that statute was not alleged in the Indictment and the Government has not argued its definition of "scheme or artifice to defraud" should be used here.  Moreover, *Skilling* limited the honest services fraud provision in § 1346 to bribes and kickbacks. 130 S. Ct. at 2933; *see also United States v. Alatrash*, 460 F. App'x 487, 490 (6th Cir. 2012) ("In *Skilling*, the Supreme Court, confronting a vagueness argument, held that the honest-services statute, 18 U.S.C. § 1346, criminalizes honest services fraud only when it involves bribes or kickbacks.").

22

means of false or fraudulent pretenses, representations, or promises (which does not require an intent to defraud). There are a myriad of ways of proving a scheme to defraud. One way to commit a wire fraud is "devis[ing] or intending to devise any scheme or artifice to defraud . . . [and] transmit[ing] or caus[ing] to be transmitted by means of wire . . . any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice." 18 U.S.C. § 1343. As discussed above, a scheme to defraud need not involve a false statement, pretense, promise, or representation. *See Mann*, 2000 WL 1597824, at *3. Rather, the statute merely requires an "[i]ntentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed." *Frost*, 125 F.3d at 354.

Another way of committing wire fraud is to obtain " money or property by means of false or fraudulent pretenses, representations, or promises, [and] transmit[ing] or caus[ing] to be transmitted by means of wire . . . any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice." 18 U.S.C. § 1343. Such a scheme to obtain money requires proof of false or fraudulent pretenses, representations, or promises; as the Court put it in *McNally*, the statute reaches "false promises and misrepresentations as to the future." 483 U.S. at 359.

Here, the Indictment alleged wire transfers that were caused to be transmitted "[i]n furtherance of said scheme to defraud" and "for the purpose of executing said scheme to defraud." Although the Indictment contained scant discussion of the alleged scheme in the actual wire fraud counts, the scheme itself is discussed in the conspiracy count under the heading "Manner and Means of the Conspiracy and Scheme to Defraud." The Government sufficiently included allegations comprising a scheme to defraud, in this case, a scheme whereby financial institutions lent money to individuals after the institutions were led to believe those individuals used their own resources

23

for down payments when, in fact, they had not. In furtherance of this scheme, the Indictment alleged Defendants wired funds or caused funds to be wired.[13] The wire fraud statute does not require any further allegations be contained in the indictment.[14]

Defendants' citation to *McNally* is off point. *McNally* focused on the use of "intangible rights" as the object of a scheme to defraud, rather than deprivation of money or property. Prior to *McNally*, some defendants were indicted for violating "intangible rights" such as a citizen's "right to have the Commonwealth[ of Kentucky's] affairs conducted honestly." 483 U.S. at 352. The section of *McNally* relied upon by Defendants, in its entirety, is as follows.

> Congress codified the holding of *Durland*[ *v. United States*, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709 (1896)] in 1909, and in doing so gave further indication that the statute's purpose is protecting property rights. The amendment added the words "or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" after the original phrase "any scheme or artifice to defraud." Act of Mar. 4, 1909, ch. 321, § 215, 35 Stat. 1130. The new language is based on the statement in *Durland* that the statute reaches "everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future." 161 U.S., at 313, 16 S.Ct., at 511. However, instead of the phrase "everything designed to defraud" Congress used the words "[any scheme or artifice] for obtaining money or property."
>
> After 1909, therefore, the mail fraud statute criminalized schemes or artifices "to defraud" or "for obtaining money or property by means of false or fraudulent pretenses, representation, or promises. . . ." Because the two phrases identifying the proscribed schemes appear in the disjunctive, it is arguable that they are to be construed independently and that the money-or-property requirement of the latter phrase does not limit schemes to defraud to those aimed at causing deprivation of money or property. This is the approach that has been taken by each of the Courts of Appeals that has addressed the issue: schemes to defraud include those designed to

---

[13] As noted above, the Indictment also contained a wire fraud count based on an email allegedly sent in furtherance of the scheme. The Court dismisses that count on venue grounds.

[14] As previously discussed, however, indictments alleging a scheme to defraud should contain far more detailed allegations than were contained in the Indictment here. The Court trusts efforts will be made on the part of supervisors in the United States Attorney's office to prevent such poor indictment drafting in the future.

Case 1:12-cr-00042-CLC-JEM    Document 113    Filed 08/08/13    Page 24 of 35
PageID #: 406

deprive individuals, the people, or the government of intangible rights, such as the right to have public officials perform their duties honestly. *See, e.g.*, *United States v. Clapps*, 732 F.2d 1148, 1152 (CA3 1984); *United States v. States*, 488 F.2d 761, 764 (CA8 1973).

As the Court long ago stated, however, the words "to defraud" commonly refer "to wronging one in his property rights by dishonest methods or schemes," and "usually signify the deprivation of something of value by trick, deceit, chicane or overreaching." *Hammerschmidt v. United States*, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924). The codification of the holding in *Durland* in 1909 does not indicate that Congress was departing from this common understanding. As we see it, adding the second phrase simply made it unmistakable that the statute reached false promises and misrepresentations as to the future as well as other frauds involving money or property.

*McNally*, 483 U.S at 357-59. Defendants argue this section of *McNally* requires the Government to allege the object of the scheme to defraud was money or property.

However, the *McNally* Court's conclusion was not that the statute requires the Government include language from the second clause in the indictment. To the contrary, the Court explicitly recognized two types of schemes in the mail fraud statute (and by extension, the wire fraud statute). The Court identified both "schemes or artifices 'to defraud'" and "schemes or artifices . . . 'for obtaining money or property by means of false or fraudulent pretenses, representation or promises.'" The Court acknowledged that the words "'to defraud' commonly refer 'to wronging one in his property rights by dishonest methods or schemes' and 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" The Court did nothing to diminish the traditional understanding of what it means to defraud someone. Rather it was using that traditional language to explain that the second prong, *i.e.*, the obtaining money or property prong, was simply added to "make it unmistakable that the statute reached false promises and misrepresentations as to the future as well as other frauds involving money or property." In other words, the added language addressed arguments that a false promise to do something in the future could not constitute fraud. Although

25

the Court agrees with Defendants that *McNally* requires the first type of scheme to involve a deprivation of money or property, it is simply a misstatement of the law to suggest the Government must include any portion of the phrase "for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" in the indictment.

Nor does post-*McNally* case law conflict with this conclusion. For instance, the Supreme Court reaffirmed *McNally*'s holding in *Cleveland*, 531 U.S. at 26. The Government indicted the defendant, Cleveland, on multiple counts, including mail fraud, after he fraudulently concealed facts in video poker license applications mailed to the State of Louisiana. The Court concluded a license was not "property" in the State's hands and accordingly, because the State was not deprived of any property, the mail fraud statute did not reach such false statements. The Government, however, argued the mail fraud statute created two distinct offenses: "(1) 'any scheme or artifice to defraud' and (2) 'any scheme or artifice . . . for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'" *Id.* at 25. Under this reading of the statute, the Government contended, "[b]ecause a video poker license is property in the hands of the licensee, . . . Cleveland 'obtain[ed] . . . property' and thereby committed the second offense even if the license is not property in the hands of the State." *Id.* The Court rejected this reading of the mail fraud statute:

> In *McNally*, we recognized that "[b]ecause the two phrases identifying the proscribed schemes appear in the disjunctive, it is arguable that they are to be construed independently." 483 U.S., at 358, 107 S.Ct. 2875. But we rejected that construction of the statute, instead concluding that the second phrase simply modifies the first by "ma[king] it unmistakable that the statute reached false promises and misrepresentations as to the future as well as other frauds involving money or property." *Id.*, at 359, 107 S.Ct. 2875. Indeed, directly contradicting the Government's view, we said that "the mail fraud statute . . . had its origin in the desire to protect individual property rights, and any benefit which the Government derives from the statute must be limited *to the Government's interests as property*

*holder.*" *Id.*, at 359, n. 8, 107 S.Ct. 2875 (emphasis added). We reaffirm our reading of § 1341 in *McNally*. *See Hilton v. South Carolina Public Railways Comm'n*, 502 U.S. 197, 205, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991) ("*stare decisis* is most compelling" where "a pure question of statutory construction" is involved). Were the Government correct that the second phrase of § 1341 defines a separate offense, the statute would appear to arm federal prosecutors with power to police false statements in an enormous range of submissions to state and local authorities.

*Id.* at 26. The Court thus concluded "that § 1341 requires the object of the fraud to be 'property' in the victim's hands and that a Louisiana video poker license in the State's hands is not 'property' under § 1341." *Id.* at 26-27.

The Court's reading of the statute is consistent with this holding. The wire fraud statute requires the scheme to defraud involve money or property, which is inherent in the common understanding of "to defraud." However, the second phrase of the statute, which Defendants argue was impermissibly absent from the Indictment in this case, is not required to be included in a charge based upon the first prong. As stated earlier, the second prong was added simply to make "it unmistakable that the statute reached false promises and misrepresentations as to the future as well as other frauds involving money or property." *McNally*, 483 U.S. at 359. Nothing in *McNally*'s or *Cleveland*'s discussion of this portion of the statute requires the Government to include the phrase "money or property" in the indictment.

Finally, Defendants point to *Faulkenberry*, in which the Sixth Circuit identified the third element of wire fraud as proof a defendant "intended 'to deprive a victim of money or property.'" 614 F.3d at 581. However, as discussed above, even more recently the Sixth Circuit discussed the elements of mail and wire fraud, stating

> [m]ail fraud requires proof of a defendant's "(1) devising or intending to devise a scheme to defraud (or to perform specified fraudulent acts); (2) involving a use of the mails; and (3) for the purpose of executing the scheme or attempting to do so." *United States v. Frost*, 125 F.3d 346, 354 (6th Cir. 1997). This court has interpreted

27

the mail-fraud and wire-fraud statutes as having essentially the same elements, except for the use of the mails versus the wires. *United States v. Bibby*, 752 F.2d 1116, 1126 (6th Cir. 1985).

*Kennedy*, 714 F.3d at 958. Not listing the intent to deprive a victim of money or property as a separate element of the offense is consistent with nearly every other circuit.[15]

Accordingly, the Court concludes the Indictment in this case sufficiently alleged a violation of the wire fraud statute. Defendants' motions for judgment of acquittal and for arrest of judgment

---

[15] *See, e.g.*, *United States v. Tum*, 707 F.3d 68, 72 (1st Cir. 2013) ("To prove wire fraud, the government had to show beyond a reasonable doubt his knowing and willful participation in a scheme to defraud and the use of interstate wires to further that scheme."); *United States v. Sheneman*, 682 F.3d 623, 628 (7th Cir. 2012) ("To establish wire fraud under 18 U.S.C. § 1343, the government must prove (1) Sheneman's participation in a scheme to defraud, (2) his intent to defraud, and (3) his use of interstate wires in furtherance of the fraud."); *United States v. Louper-Morris*, 672 F.3d 539, 555-56 (8th Cir. 2012) ("To establish wire fraud pursuant to 18 U.S.C. § 1343, the United States needed to prove beyond a reasonable doubt that 1) Appellants joined a scheme to defraud; 2) they intended to defraud; 3) it was reasonably foreseeable that interstate wire communications would be used; and 4) the wires were, in fact, used."); *United States v. Okun*, 453 F. App'x 364, 368 n.2 (4th Cir. 2011) ("The elements of wire fraud are: (1) the existence of a scheme to defraud and (2) the use of wire communication in furtherance of that scheme." (citing *United States v. Curry*, 461 F.3d 452, 457 (4th Cir. 2006)); *United States v. Keller*, 395 F. App'x 912, 914 (3d Cir. 2010) ("[T]he essential elements of wire fraud [are] (1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use, or cause of use, of interstate wire communications in furtherance of the scheme."); *United States v. Valencia*, 600 F.3d 389, 431 (5th Cir. 2010) ("To prove wire fraud, the government had to show a scheme to defraud, the use of wire communications in furtherance of the scheme, defendants' specific intent to participate in the scheme, and materiality of defendants' communications."); *United States v. Lake*, 472 F.3d 1247, 1255 (10th Cir. 2007) ("The elements of the offense of wire fraud in this case are (1) a scheme to defraud, (2) an interstate wire communication, and (3) a purpose to use the wire communication to execute the scheme."); *United States v. Alston-Graves*, 435 F.3d 331, 337 (D.C. Cir. 2006) ("The elements of the wire fraud offense were that she knowingly and willingly entered into a scheme to defraud and that an interstate wire communication was used to further the scheme."); *United States v. Shipsey*, 363 F.3d 962, 971 (9th Cir. 2004) ("Wire fraud has three elements: (1) a scheme to defraud; (2) use of the wires in furtherance of the scheme; and (3) a specific intent to deceive or defraud."); *United States v. Poirier*, 321 F.3d 1024, 1028 (11th Cir. 2003) ("The elements of a § 1343 wire fraud violation are: (1) intentional participation in a scheme to defraud; and (2) use of wire communications to further that scheme.").

will be **DENIED** on this ground.

### 2. Harmless Error

Although the Court concludes the Indictment in this case contained sufficient allegations, the Government has identified yet another reason to uphold Defendants' convictions: Even were the Government required to affirmatively allege the object of the scheme to defraud was money or property, its absence from the Indictment would constitute harmless error.

The Government argues "technical" insufficiencies of an indictment should be raised at early points in the proceedings, and the Court should not grant Defendants' motions at this stage of trial. *United States v. James*, 980 F.2d 1314, 1316-17 (9th Cir. 1992) ("We held that the indictment had 'sufficiently informed [the defendant] of the nature of the . . . charge so that no prejudice to him could have ensued. Absent such prejudice, the conviction may not be reversed for any omission in the indictment.'"). Generally, a failure to list the elements of the charged offense renders an indictment legally deficient, and a legally deficient indictment requires dismissal. *United States v. Landham*, 251 F.3d 1072, 1080 (6th Cir. 2001) ("Whether the elements of the offense are adequately alleged in the indictment is a legal question subject to de novo review. If the indictment is legally deficient, the proper result is dismissal of the indictment.") (citations omitted). However, "[a] constitutionally deficient indictment is subject to harmless-error review." *Williams v. Haviland*, 467 F.3d 527, 535 (6th Cir. 2006) (citing *United States v. Cor-Bon Custom Bullet Co.*, 287 F.3d 576 (6th Cir. 2002)). Because the requirement an indictment contain all the elements of the offense is intended "primarily to ensure that an accused is reasonably informed of the charge made against him so that he can prepare a defense[,]" *Cor-Bon*, 287 F.3d at 580, a constitutionally deficient indictment will not require dismissal where a defendant suffered no prejudice at trial, *Williams*, 467 F.3d at 535.

29

Consistent with Fed. R. Crim. P. 52(a), which provides "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded," a defendant must show a deficient indictment affected his substantial rights, in that it "'prejudice[d] [] his ability to defend himself at trial, [] the general fairness of the trial, or [] the indictment's sufficiency to bar subsequent prosecutions,'" *Cor-Bon*, 287 F.3d at 580 (quoting *United States v. Hathaway*, 798 F.2d 902, 911 (6th Cir. 1986)).

The Indictment in this case focuses on a scheme to defraud in the conventional sense in that money or property was the obvious and clear object, albeit without explicitly containing the phrase "money or property." The wire fraud counts state "[i]n furtherance of said scheme to defraud the *financial institutions*" (emphasis added). The words "financial institutions" is a clear indication that the object of the scheme was to obtain something from the financial institutions. What separates financial institutions from other businesses is that financial institutions have money. It requires no leap of logic to conclude that what one would wish to obtain from a financial institution by fraud is money. And although the wire fraud counts do not specifically allege what money or property was the object of the scheme to defraud, the Indictment does incorporate the conspiracy allegations. In these allegations the Indictment alleges that property was for sale, that there were mortgages, that prospective buyers were assured that Defendants would provide the down payments, that Defendants would provide monthly mortgage payments, that false "gift letters" would be used, and that Defendants would buy back the properties at a profit to the buyers at the end of a three-year period. Thus from the Indictment it was clear that the money Defendants desired to obtain was money from the financial institutions. The Defendants were on notice regarding what theory the Government was pursuing and what property the Government considered to be the object of the scheme to

30

defraud.

Further, in paragraph five of the conspiracy count, the Indictment references "deposits of illegal proceeds in interstate commerce." A generous reading of the Indictment could transpose this portion of the conspiracy charge onto the wire fraud counts, and establish the object of the wire fraud scheme. This provision, however, appears to refer to the money laundering charges. Indeed, all but one count of wire fraud is a wire of funds from Defendants or possible co-conspirators to an individual's account for later use in defrauding the financial institutions. The illegal *proceeds* are not implicated until the money laundering charges, which list deposits of the mortgage funds into Defendants' various accounts. However, the money laundering charges specifically incorporate the wire fraud charges, indicating "the property involved in the monetary transactions was criminally derived from a specified unlawful activity, i.e. the wire fraud in violation of Title 18, United States Code, Section 1343, *as charged in Counts 2 through 8 of this Indictment*" (Court File No. 3) (emphasis added). As a result of this allegation, Defendants were aware the property described in the money laundering charges constituted the property "criminally derived" from the alleged wire fraud. Defendants were on notice not only of the theory the Government was pursuing but specifically what money the Government considered to be the object of the alleged scheme.

Moreover, the Government clearly intended to pursue a deprivation of money or property theory and offered evidence accordingly. The jury instructions were wholly focused on a money or property theory and explicitly instructed the jury "[t]he term 'scheme or artifice to defraud' includes any plan or course of action intended to deceive or cheat someone out of money or property by means of fraud or fraudulent means." In addition to being sufficiently apprised of the Government's theory by the Indictment, the actual proof at trial and the jury instructions also

31

ensured Defendants suffered no prejudice from the absence of the phrase "money or property" in the Indictment.

Accordingly, even if the Government's failure to include an allegation as to the deprivation of money or property constituted error, Defendants suffered no prejudice in mounting their defenses. Any error was therefore harmless error and does not require entry of a judgment of acquittal or an arrest of judgment. *See Cor-Bon*, 287 F.3d at 580 ("Although an affirmative act constitutes an element of a [26 U.S.C.] § 7201 case, this court need not decide whether an indictment under § 7201 must allege an affirmative act because the deficiency in the indictment here, if any, constituted harmless error."). Defendants were well aware of the money they were alleged to have obtained through the scheme and were able to "pursue[] a vigorous defense to attempt to show that [they] had not committed the[] [offense]." *Id*. In fact, during the Government's case-in-chief, Defendants were fully prepared to highlight for the jury the variances between the Indictment's allegations and the proof offered regarding which deposits were made from the financial institutions, in what amount, on what day, and to which organization's account. Moreover, Defendants' theories were never based on the contention the defrauded institutions did not suffer a loss or that Defendants did not intend to receive the principal. Rather, Defendants argued they did not have the requisite intent to defraud because they believed their various gift-letter transactions were legal. It is also unlikely Defendants' theories would have changed had the Indictment affirmatively stated the object of the scheme or artifice to defraud was to obtain money or property. Defendants, for their part, have offered no such alternative theory.

Solely excluding the phrase "for obtaining money or property" is not fatal to the Indictment. Even were the Government required to affirmatively allege a deprivation of money or property as

the object of the scheme, Defendants suffered no prejudice from this omission. Defendants' motions will be **DENIED** on this ground.

### C. Variance

Defendants also seek dismissal of two of the money laundering counts, Counts Eleven and Twelve, due to a variance between the Indictment's allegations and the proof offered at trial. Specifically, Count Eleven alleged a $166,487.13 deposit to Southern Group, LLC whereas the proof established the deposit amount was $167,249.63 to Southern Property Management, LLC. Count Twelve alleged an April 29, 2010 deposit of $67,000 to Southern Mountain Resorts whereas the proof established an April 30, 2010 deposit to Southern Management's account.

Amendments to indictments are prohibited, but variances are acceptable in some instances. "An amendment involves a change, whether literal or in effect, in the terms of the indictment." *United States v. Prince*, 214 F.3d 740, 756-57 (6th Cir. 2000) (internal quotation marks and citations omitted). A constructive amendment occurs when "the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of an offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *Id.* Amendments and constructive amendments are *per se* prejudicial.

A variance, on the other hand, is reviewed for harmless error. "[A] variance occurs when the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *Id.* (internal alterations omitted). A variance may change an indictment so much it constitutes a "constructive amendment." *Id.* Otherwise, a conviction will only be reversed if a demonstrated variance affects some substantial right, such as

33

prejudicing a defendant's ability to defend himself or affecting the overall fairness of the trial. The Sixth Circuit has articulated the purpose of this rule:

> The purposes underlying the rule against amendments and constructive amendments include notice to the defendant of the charges he will face at trial, notice to the court so that it may determine if the alleged facts are sufficient in law to support a conviction, prevention of further prosecution for the same offense, and finally, of "paramount importance," the assurance that a group of citizens independent of prosecutors or law enforcement officials have reviewed the allegations and determined that the case is worthy of being presented to a jury for a determination of the defendant's guilt or innocence.

*United States v. Moore*, 129 F.3d 873, 878 (6th Cir.1997) (quoting *United States v. Beeler*, 587 F.2d 340, 342 (6th Cir. 1978)).

The variances here are not fatal. The charge of money laundering has not changed, nor have any of the essential elements of the charge been so modified as to constitute another offense. Defendants were on notice of not only the charges they faced, but the general time period and deposit amounts at issue. Although the proof varied slightly from the allegations in the Indictment, Defendants were not prejudiced in their ability to present a defense. It is unclear how Defendants would have proceeded differently had the Indictment accurately reflected the evidence. *See United States v. Adamson*, 291 F.3d 606, 615-16 (9th Cir. 2002) (holding a variance was fatal because it misled the defendant and obstructed the defendant's defense at trial where indictment alleged a wire-fraud misrepresentation as to *whether* servers had been upgraded but the proof showed the misrepresentation was *how* they were upgraded).

The Second Circuit refused to overturn a defendant's conviction on similar facts to those at issue here, although in the context of a wire fraud count. In *United States v. Dupre*, 462 F.3d 131 (2d Cir. 2006), the indictment alleged a wire fraud scheme in "advance fee fraud." The indictment specified a transfer from Irving, Texas but the proof established a transfer from Liberty Township,

Ohio. *Id.* at 141-42. Because the alleged dates included the time period the actual transfer occurred, and the Government disclosed the exhibits and witness's statements before trial, thus putting defendants on notice, the court concluded the variance was not prejudicial. *Id.* at 142. The trial court's charge to the jury required they unanimously agree a fraudulent interstate wire transfer occurred. *Id.* at 142-43. This charge was sufficient to render the variance harmless.

Here, Defendants similarly suffered no prejudice as a result of the variance. They were aware of the charges against them. The jury instructions required the jury find the elements of money laundering were otherwise satisfied. Accordingly, the variance between the Indictment and the proof offered at trial is not fatal. Defendants' motions will be **DENIED** on this ground.

## IV.   CONCLUSION

For foregoing reasons, the Court will **DENY IN PART** and **GRANT IN PART** Defendants' motions (Court File Nos. 87, 88, 89, 90, 91). Specifically, the Court will grant Defendants' motions on Count Seven because the Government offered insufficient evidence to establish venue. With respect to the other counts, the Court will **DENY** Defendants' motions.

**An order shall enter.**

*/s/*_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**